JAMES GILMORE *vs.* WALTON G. KILBOURN.

Worcester. September 26, 1944. — December 6, 1944.

Present: FIELD, C.J., QUA, DOLAN, WILKINS, & SPALDING, JJ.

*Negligence*, Bale of hay. *Evidence*, Matter of conjecture.

The mere fact, that wires binding a bale of hay all broke at once when the bale without the use of hooks was being lifted to be placed upon a truck, did not warrant a finding that they were of insufficient strength.

Testimony at the trial of an action for personal injuries, sustained when binding wires with which the defendant had baled hay broke as the plaintiff was loading the bale upon a truck, left the cause of the breaking a matter of conjecture and did not warrant a finding of negligence of the defendant.

TORT. Writ in the Second District Court of Eastern Worcester dated September 2, 1941.

On removal to the Superior Court, the case was tried before *Broadhurst*, J.

*W. W. Buckley*, (*H. T. Broderick* with him,) for the plaintiff.

*M. C. Jaquith*, for the defendant.

WILKINS, J. This is an action of tort to recover for personal injuries sustained by the breaking of wires around a bale of hay prepared by the defendant for delivery to the plaintiff's employer. A verdict for the plaintiff was recorded under leave reserved by the judge, who subject to the plaintiff's exception allowed a motion of the defendant to enter a verdict in his favor.

According to the bill of exceptions certain facts "were established by the evidence and were not in dispute": On April 15, 1939, the plaintiff and three other employees of a Dr. Desmond went to Lancaster to a barn, occupied by the defendant, to get a load of hay. Several weeks before Dr. Desmond had purchased the hay for delivery at the barn. Other loads previously had been taken by the plaintiff and his fellow employees, one being on the previous day, at which time the plaintiff and these others had built in the

barn a platform of bales from which to load to a truck owned by Dr. Desmond. On the afternoon in question when the plaintiff arrived, the truck was partially in the barn and backed to the platform. A baling machine in the barn was in operation by the defendant, and some bales were on the floor ready for loading. The bales, held together by three wires, were approximately forty-two inches by seventeen inches by twenty-one inches, and varied in weight from one hundred to one hundred fifty pounds, the average being one hundred twenty-five pounds. The defendant had nothing to do with loading, which was done in the following manner. The bales on the floor were picked up by the plaintiff and one Albert, a fellow employee. Each took one end of a bale, lifted it between them, and carried it by hand to the platform, from which they pushed it up to one Blair, a third employee on the truck, who stooped over and pulled it up. The plaintiff and Albert selected, as far as possible, the heaviest bales. The plaintiff was injured when the truck was almost loaded with twenty-five to thirty bales. The plaintiff and Albert had carried a bale onto the platform, and raised it to place it on the truck. At this moment the bale broke, knocking the plaintiff off.

The testimony as to how this happened was given by Albert and the plaintiff. Albert testified, "We got a bale of hay, and we picked out the heaviest one so the load wouldn't be too high; this bale maybe weighed one hundred fifty pounds. We picked it up, climbed up on the stairs [of the platform] and were pushing it on the truck, the load was getting high; we had it about shoulder high. He was on the left and I was on the right, and we were just pushing it up when all the wires gave and the bale swung open and hit" the plaintiff. "After they pushed it so far the man on top grabbed it, the witness and the plaintiff kept pushing, and the man on the load pulled it up. All three used their hands and none of them had . . . baling hooks. . . . While they were pushing the bale up, all the wires on the bale broke. He could hear the wires break. There was a cracking noise. He did not notice anything

about this particular bale when they picked it up leading him to believe it might' break. It was a good looking bale . . . heavy . . . and not loose." "There was one broke and all broke together the pressure of the bale."

The plaintiff testified: The bale which broke weighed about one hundred thirty-five pounds. All three wires were around the bale· when they picked it up, one being in the centre and the other two about five inches from the middle one and four or five inches from each end. These were the same in size and style as the wire on the other bales. Albert and the plaintiff picked up the bale twenty to thirty feet from the steps. They each had hold of it all the time and did not drop it or set it down. "Me and Mr. Albert got up these stairs, walked along; we just raised it up, and we got it up to . . . about even with my chest here, when it broke off." They had turned it endwise before raising it. "There was a loud snap, all snapped right open." There was no warning. Asked how many snaps he testified, "I remember just practically all together." None of them, including Blair, had a hook. Blair did not take hold of the bale that broke.

The only testimony as to the appearance of the broken wires came from Albert, and offered a wide choice of numerous inconsistent combinations of facts. We attempt to cull out those that might be considered most favorable to the plaintiff. See *Kelly* v. *Railway Express Agency, Inc.* 315 Mass. 301, 302. He examined the broken bale. "The hay was spread out and the wires which had held the bale together were lying on the platform. The wire was smaller than telephone wire, black in color, with some rust spots on it. There were three wires which had gone around the bale, all of the same length. Some of it was spliced between the ends. All three wires were broken. . . . Some let go where they had been spliced." ·He testified that the number of pieces of wire that he picked up was three, and also that it was six. The first piece was six feet long with rust on it. "It was not all rusty, about half. Just a couple of places where there was a little bit of rust. . . . One or two little rust spots." He testified that this wire came apart

at a splice and also, to the contrary, that the splice was intact. The second piece was the same length, with rust on it, how many spots he could not say. It had a hook on one end and an eye on the other. The third piece was six feet long, "an eye [sic] at one end and a loop [sic] at the other — the same as the other two." Each of the three pieces had a splice. The first wire had come apart at the splice, and the others "came out of the loop." There "were six pieces of wire on the platform. The first wire had come apart at the splice and the other two had broken somewhere between the ends. He picked up six pieces. 'The other two wires that let go were not spliced.' . . . All three had been spliced. Only one had come apart at the splice. The other two remained intact at the splice but broke elsewhere." The witness drew a diagram "of the wire that came apart at the splice," which he described as "Just a little curl."

The defendant testified to the method of baling. The baling machine consisted of a compression chamber, larger at one end than at the other, which the hay entered through the larger end on a moving board or belt. A piston pressed the hay so that, as the small end was approached, it became more tightly compressed. There were successively placed in the chamber two boards with slots which permitted wires to be passed around a bale and fastened. The defendant placed the wires, when slack, lengthwise around the bales and fastened them by putting the hook through the eye. The total of the four sides traversed by the wires was nine feet ten inches. As a bale came out of the chamber, the pressure of the bale drew the wires tight, and it landed on end on platform scales, where it was weighed and then moved by the defendant's employees to a point on the barn floor. The wires of the uniform length of nine feet six inches, with hook and eye, had been purchased from a reputable concern. The wire for "some months" had been stored in the barn, where there was no heat and where it was subject to natural dampness. The defendant knew that under these conditions metal would rust, and that "metal weakens in those spots where it rusts." He did not

know the tensile strength or the amount of pressure the wire would take, and had not tested it. There was also testimony from the defendant, which the jury theoretically did not have to accept, to the effect that splices were used only to make a piece longer than nine feet six inches; that pieces were not spliced in the middle, but only through the hook and eye; that a splice is stronger than any part of the wire "because you got double wires"; that occasionally in tying a heavy bale it is not possible to fasten the third or top wire without lengthening it; and that the bottom and middle wires are easy to hook, but the top wire, which is tied last, must be hooked at the right time, and if that time passes, more hay goes into the bale, necessitating a splice in order to tie it.

The plaintiff contends that the bale burst because the wire (1) "was not of sufficient strength to hold the pressure," and (2) "was otherwise defective and was improperly spliced." We assume without deciding that the defendant owed a duty to the plaintiff in baling the hay, so we do not consider the defendant's contention that there was no such duty because title to the hay had passed to Dr. Desmond, or the plaintiff's counter contention that the bale was inherently dangerous.

The contention that the wires were of insufficient strength is unsound. It is unsupported by evidence. It rests upon the mere occurrence of the mishap. As hereinafter discussed, it is not a situation, as in *Doherty* v. *Booth*, 200 Mass. 522, 525, where the jury might infer that the bale could not have burst except by reason of the defendant's negligence.

The contention that the wires were defective and improperly spliced likewise is untenable. If there was evidence of negligence in using the wire because of rust, there was, nevertheless, no evidence that any reasonably obvious defect in the wire caused the bale to burst. But two pieces were described as rusty, and none as breaking where there was rust. Compare *Callaghan* v. *R. H. White Co.* 303 Mass. 413, 416. In fact, the only testimony as to where the wires broke was that one broke — and also did not break —

where it was spliced, and that the others broke where there was no splice, and also that they came apart at the hook and eye. Assuming that the wires were all spliced, and one actually did break where spliced, the plaintiff is not helped. There was nothing to show that they were improperly spliced, or that it was improper or unnecessary to splice them at all. Most significant, the testimony was wholly to the effect that there was substantially a simultaneous breaking of the entire number of wires. "All broke together." "There was a cracking noise." "There was a loud snap . . . just practically all together." The evidence does no more than to reveal a series of uncertainties. "It is fully as consistent with the absence as with the presence of carelessness." *Olsen* v. *New England Fuel & Transportation Co.* 251 Mass. 389, 393–394. While the plaintiff was not bound to exclude every possible cause for his injury but the negligence of the defendant, he was nevertheless required to show by a preponderance of the evidence that it more likely resulted from a cause for which the defendant was responsible than from one for which he was not. *Mucha* v. *Northeastern Crushed Stone Co. Inc.* 307 Mass. 592, 596. *Howe* v. *Boston,* 311 Mass. 278, 280. *Ruffin* v. *Coca Cola Bottling Co.* 311 Mass. 514, 516. The plaintiff did not sustain this burden. It was fully open on the evidence to find that the wires had given way by reason of some occurrence during the handling of the bale by the plaintiff and Albert, as, for example, by striking against some object or objects while being pushed up to Blair on the truck, or by reason of some hidden defect in manufacture not reasonably discoverable by the defendant.

The judge rightly entered a verdict for the defendant under leave reserved. The case falls within *Childs* v. *American Express Co.* 197 Mass. 337, 338–339, *Connolly* v. *Felter,* 238 Mass. 305, *Starr* v. *Chafitz, ante,* 227, and similar decisions. The cases cited by the plaintiff are distinguishable for various reasons.

*Exceptions overruled.*